# Richmond

W. W. HOUSTON, E. J. ROBERTSON, ET AL. V. ROBERT F.
BAIN, EXECUTOR, ETC.

April 28, 1938.

Present, All the Justices.

The opinion states the case.

*Leon T. Seawell, John B. Jenkins, Jr., Joseph Marcus* and
*H. H. Rumble,* for the appellants.

*Plummer & Bohannan,* for the appellee.

BROWNING, J., delivered the opinion of the court.

Robert F. Bain, executor of P. D. Bain, deceased, in-
stituted this suit, in equity, against certain endorsers on a
note for $27,610, in which he seeks to recover from Richard
Winborne and C. E. Herbert, two of such endorsers, the sum
of $6,280, with interest thereon, or if these parties are in-
solvent, then to recover from the remaining endorsers, de-
fendants, their pro rata part of the amount which the com-
plainant paid in excess of his decedent's proportionate part
of the indebtedness on account of the said note, with in-
terest. The parties will sometimes hereafter be referred
to as plaintiff and defendants, the relationship they bore in
the trial court.

The plaintiff's decedent, P. D. Bain, and the defendants
were stockholders and directors in the Hampton Roads Fire
and Marine Insurance Company. In 1928 or 1929, the com-
pany became involved in financial difficulty and it became
necessary to increase its capital stock in the amount of
$100,000. This had to be done in order to avoid liquidation
and to rehabilitate the company. The scheme adopted to this
end was that the additional stock was to be purchased by
the existing stockholders in such ratio as the amount of
their respective holdings bore to the total amount of the
outstanding stock.

After the major portion of the new stock had been dis-
posed of there remained a balance of $27,610, which was
necessary to make the full $100,000. This was imperative.
A number of the stockholders, who were more or less active
in the conduct of the company as officials and directors, set
out to secure the necessary balance among themselves. The
plaintiff's decedent, P. D. Bain, who was the chairman of
the board of directors of the company, E. J. Robertson,

who was its president, and C. E. Herbert, S. D. Scott, Otto Wells, Richard Winborne, W. W. Houston, F. B. Bain and J. W. C. West, directors, voluntarily incurred this burden. Seven of these parties subscribed to 157 shares of this stock each, P. D. Bain subscribed to 156½ shares and West subscribed to 125 shares. The subscription price was $20 a share, which, in the aggregate, made the $27,610 of stock, which completed the necessary $100,000 subscription.

The overwhelming evidence shows that this additional capital was necessary if the company was to continue business and avoid liquidation, and it is patent, indeed admitted, that what was done in connection with it was for the benefit of the company.

The shares of stock were issued to the several subscribers mentioned and the certificates were attached to the individual notes of the respective purchasers, evidencing the amount of stock which they had purchased. The evidence of certain of the defendants discloses that P. D. Bain undertook to get these notes discounted at a Norfolk bank and so obtain the necessary capital. It appeared in the beginning that two of the makers of these notes were in straightened circumstances and it later became evident that both of them were insolvent. The bank declined to discount the several individual notes and, in order to obtain the money necessary to accomplish the purposes of the company, P. D. Bain executed a note for the entire sum of $27,610, which the other persons involved endorsed. J. W. C. West limited his liability, by his endorsement on the note, to the sum of $2,500, which was the amount of his stock subscription. The several individual notes, with the stock certificates attached, were attached to the note for $27,610, which is designated in the record as "the master note." This note was discounted at the Norfolk National Bank of Commerce and Trusts and the proceeds went to the credit of the Hampton Roads Fire and Marine Insurance Company. With the completion of this accomplishment the necessary capital was secured and the money paid in, which saved the company from liquidation and put it on its feet for a time.

The master note was renewed from time to time for ninety day periods. P. D. Bain died in February, 1930. The last renewal of the note was on May 12, 1930, the renewal note being executed by the executor of Mr. Bain, who was the plaintiff in the trial court. The original endorsers continued to endorse the renewal notes. It appears that the renewal endorsements were secured by Mr. Deck, the auditor and manager of the company.

It is strange that nowhere in the record does it appear how and by whom the first interest or discount charged by the bank on the master note was paid. The circumstances already related would seem to suggest that it was paid by the company, by deducting the amount of it from the proceeds which passed to its credit. Mr. Hilton, a witness for the defendants, who was the secretary, a director and a member of the finance committee of the company, stated that the company had earned a dividend of $1.20 a share on the Class A stock, which had been subscribed, and this dividend and subsequent ones were applied to the payment of the interest on the master note as it matured, and these payments and the renewals were handled by Mr. Deck.

In 1930, the Hampton Roads Fire and Marine Insurance Company was sold to the National Fidelity Insurance Company of Baltimore. The terms of this transaction made it necessary for the company to gather in its outstanding stock for delivery to the purchaser to complete and perfect the transfer. The several parties paid their individual notes, except P. D. Bain, who was dead, and Winborne and Herbert, who were insolvent and unable to pay. The payments that were made were credited on the master note. Incidentally, this fact is an impressive *indicia* of the truth of the plaintiff's contention that the transaction represented a case of joint liability. We think this is not impaired, in this instance, by the custom of banks to credit the main note by collections derived from the disposition of collateral. This thought is strengthened by the fact that none of the parties are shown by the record to have de-

manded a release from their endorsements upon the payment of their individual notes.

The executor of P. D. Bain's estate paid the individual note of his decedent and also the notes of Herbert and Winborne, because it was necessary to deliver the stock, which was deposited as collateral, to the Baltimore company, the purchaser. Before payment, the executor tried to collect the notes of Herbert and Winborne but without success. He also demanded of the other defendants contribution by the payment of their proportionate parts of the Herbert and Winborne obligations, but this was refused. At this time the stock of the company was without value.

The plaintiff then filed his bill in equity against all of the endorsers to compel payment by Herbert and Winborne if possible, and, if not, compel contribution as to the others. The suit was instituted upon the theory that the whole matter pertaining to the master note was a joint venture; that all of the endorsers, including the maker, P. D. Bain, had a common interest in the weal of the company; that they had all made substantial investments in its capital structure; that the fact that P. D. Bain and his relatives, and a partnership of which he was a member, had much larger interests in the company than the others is not of much moment, because Mr. Bain was a rich man and he really had little more in the company than the others who were not so circumstanced and, it may be, had much of their all invested there; that the company was confronted with a crisis; that it was a Maryland corporation and it had assured the commissioner of insurance of that State that the issue of stock of $100,000 had been fully subscribed and the money paid in, and it is suggested in the record that an official of that department was en route to Norfolk to verify this statement, among other things; that in the impending dilemma it was well that the company had a zealous official who had the financial standing to secure a loan of the magnitude of this one and who was willing to further hazard his assets in its interest.

To our minds the form of the transaction was simply a means to an end which was desired by all of the parties because it was in their interest to erect again and make a going concern out of a tottering one. Bain was willing to back his faith in it by lending his name and his credit for their common good.

It is true that Mr. Scott and Mr. Robertson vigorously deny the plaintiff's contention and contend that the obligation was Mr. Bain's, and that they and the others endorsed the note for his accommodation. But we think the facts in the case, made plain by the evidence, effectively negative this contention. The very existence of the company, in which all of the parties had substantial amounts of money tied up, depended upon the change in the capital structure by securing the $100,000 of additional stock. Hilton, a witness already referred to, testified that the man in charge of the Chicago office of the company, Mr. McCullough, was brought here purposely to expedite the sale of that stock because there was a time limit on it and the money had to be paid within a definite date in order that the company could put its balance sheet in an acceptable position with the insurance commissioners of the various States in which it did business. Surely this was a consummation devoutly to be wished by those in interest.

The defendants urge that the form of the note, that is, Bain signing it as maker, at the place for such signature, and the others on the back of the note as endorsers, is highly determinative of the relationship of the parties *ex consuetudine*. It does raise a presumption to the above effect but this is effectually rebutted by the evidence and the circumstances.

It is impressive to note that Mr. West made a point to limit his liability by his endorsement, which stared the others in the face at various periods of endorsement through the life of the note and, according to the testimony of Mr. Herbert, Mr. West brought up this question of limiting their liability at one of the meetings, so that in the beginning it was a matter that had been brought to their attention. Mr.

West testified that he endorsed the note at the earnest solicitation of Mr. Scott, who said that Mr. Bain was the maker and there could not possibly be any liability on the endorsers. This appears to emanate from Mr. Scott and declared upon his own initiative.

Mr. Herbert testified that Mr. Deck came to him with the note and told him to sign it and the company would take care of it. This does not fit in with the contention that Mr. Bain was primarily liable as the maker of the note.

Mr. Bain was a very wealthy man. His financial standing, as described by the defendants, was of the best. We think that the record justifies the statement that he was a forthright man. This type of person has nothing to conceal. If he were primarily liable, and the endorsers of the note so regarded him, and he held himself out so to be, why was it necessary or desirable to be secretive about it? Why should there have been any doubt about a fact which could not possibly have had any obloquy connected with it?

This thought occurs to us as worthy of mention and as of potentiality. If the other endorsers knew at the time they first endorsed the master note that Herbert and Winborne were not responsible financially, they were charged with notice that what they had assumed to pay would have to eventually be discharged by someone else in some way, and it was incumbent upon them to thresh out then and there the matter of ultimate liability. If the defaulting endorsers had not been accepted and the number of responsible ones reduced thereby to seven, their proportionate shares of the amount of the master note, or the sum required to rehabilitate the company, assuming that there would have been no diminution in their zeal for its welfare, would have been the same that the trial court has adjudged against them.

The defendants urge that there is a variance between the *allegata* and the *probata;* that the plaintiff's bill makes out one case and the evidence another; that the defendants are declared to be liable on the note as comakers and that the court treated the matter as one of cosuretyship, which

presents a paradoxical situation. This seems to us as grasping after straws. We are impressed with the way in which it is treated in the brief for the appellee. There it is said:

"With the facts before the court, the court could have reached any conclusion justified by such facts. But there is no inconsistency between the bill and the opinion of the court. A surety is one who undertakes to pay money or do some other act in the event that his principal, the party whose debt or obligation it is, fails therein. And as between P. D. Bain and the endorsers, the latter were not sureties, and the bill so alleges. But as between Bain and the endorsers, the parties were cosureties, each being equally bound and each being liable as between themselves to contribute to the payment of any amount paid by anyone in excess of his just liability *inter se*. The principles of cosuretyship are discussed in the case of *Claybrook* v. *Scott,* 1 Va. Dec. 316, 319, in which case the court says: 'In ascertaining whether such cosuretyship exists as to give the right to contribution, the court looks to the real transaction. The liability depends not on its form, but its essence. And parol evidence is admissible to show what the contract was, out of which the alleged liability to contribution arises.'"

This case involves the equitable right of contribution, as to which Mr. Lile, in his notes on Equity Jurisprudence says: "When one surety pays more than his share of the debt, he calls upon his cosurety for contribution—that is, he demands that the cosurety shall help to bear the common burden." The general principles of contribution have been stated in the following language:

"Where two or more persons are jointly liable to pay a claim and one or more of them pays the whole of it, or more than his or her share, the one so paying may generally recover from the others the ratable proportion of the claim that each ought to pay. The right to contribution does not arise out of any express contract or agreement between the parties to indemnify each other, but on the broad principles of equity which courts of law enforce that where two persons are subject to a common burden it shall be borne

equally between them. The law implies a contract between the parties to contribute ratably towards the discharge of the obligation. It is immaterial whether the parties are jointly or jointly and severally liable as principal debtors. In order to enforce contribution the payment must have been made by one obligated to pay the whole, as between himself and the payee, but only bound to pay a proportionate part as between himself and his co-obligors. See *Elliott on Contracts*, section 1396, citing *Wayland* v. *Tucker*, 4 Gratt. (45 Va.) 267, 50 Am. Dec. 76, which holds that:

" 'The right of one surety to call upon his co-surety for contribution arises from a principle of equity growing out of the relation which the parties have assumed towards each other; the equity springs up at the time of entering into that relation, and is fully consummated when the surety is compelled to pay the debt.

" 'Contribution among sureties is founded in natural justice and the equitable principle of equality of burden and benefit. If one of a number of sureties discharges the common burden, the others are bound to contribute equally to his relief, in the event of the insolvency of the principal; and if any of them are insolvent, their share must be apportioned among those who are solvent. These principles are well settled.' "

As to the contention that the defendants were accommodation endorsers for Mr. Bain, it was said in the case of *Cox* v. *Hagan*, 125 Va. 656, 671, 100 S. E. 666, 670: "The prevailing rule seems to be that as between the parties liable upon a note having knowledge of their true relations one to another, parol evidence is admissible to show such true relationship regardless of where the signatures appear on the note, whether as maker or endorsers, and regardless of the order of sequence of the endorsements (8 Cyc. (k) pp. 262-3; 3 R. C. L. sec. 338, p. 1123) and by statute with us (subsection 68 of section 2841a of the negotiable instrument law), it is provided as follows: 'As respects one another, endorsers are liable *prima facie* in the order in which they endorse; but evidence is admissible

to show that as between or among themselves they have agreed otherwise.' "

"So evidence of the relations of the parties, and of the circumstances under which a written contract was made, may be given in order to explain the intention when not plainly expressed." *Woodward, Baldwin & Co.* v. *Foster,* 18 Gratt. (59 Va.) 200, 207.

■ "The position of the signature of the maker is not controlling. Thus the signature of a person on the back of the note may constitute him a maker where apparently so intended." 8 C. J. 65.

■ "Makers may occupy the relation of principal and surety between themselves, but nevertheless be all principals as to the payee or the holder; and the holder is ordinarily not affected by agreements between the makers as to their respective liability." 8 C. J. 69.

■ "The rights and liabilities of makers, as between themselves, depend on the contract between them and the relation they sustain to each other and to the transaction. One maker may show that he was in fact a surety for another." 8 C. J. 70.

See *Daniel on Negotiable Instruments,* section 1340, and the following sections: "As between the immediate parties, the interpretation ought to be in every case such as will carry their intention into effect, and that their intention may be made out of parol proof of the facts and circumstances which took place at the time of the transaction."

■ The decree of the trial court seems to fix a several liability upon the defendants although it refers to the "joint obligation of the parties." We think that the liability is a joint one and the trial court should have so held.

■ In the case of *Armstrong* v. *Henderson,* 99 Va. 234, 237, 37 S. E. 839, 840, the court says: "In a joint contract for the benefit of all, each takes upon himself the liability to pay the whole debt, consisting of the share which each co-contractor ought to pay as between themselves; and each, in effect, takes upon himself a liability for each to the extent of the amount of his share. Each, therefore, may be

considered as becoming liable for the share of each one of his co-contractors, at the request of such co-contractor."

See 6 R. C. L. 879, from which the following is quoted:

"Liability under Joint Contract.—It is an incident of every joint contract, that all are bound to its performance. Each and every one of the contractors stipulates that the contract shall be performed by all. They become sureties for one another for the performance of the thing contracted to be done. Thus under a contract by two firms for the purchase of electrotype plates to be used in a publication in which they are jointly interested, which contract is in form joint and provides that they will be responsible for any and all wrong use of said electrotypes, one firm which sells all its interest to the other may be held for damages caused by a breach of the contract by the other after the sale. Likewise, where several persons are jointly indebted, and one of them pays his specific share of the debt, and it is received and receipted for by the creditor as such, such payment will not exonerate the party paying from his liability for the residue of the debt. Such receipt, not being under seal, is neither a severance of the indebtedness nor an effectual release; and notwithstanding such receipt, the parties to the contract will remain jointly bound to the extent of what is unpaid, in the same manner as if no such specific payment had been made. Moreover, the fact that two parties are jointly bound under a contract does not prevent one of them from binding himself separately by a subsequent contract in reference to the same subject-matter."

In the Restatement of the Law of Contracts, section 117, the following is found: "Each person bound by a joint promise is bound for the whole performance thereof, but by making appropriate objection, can prevent recovery or judgment against him unless there are joined as defendants all promisors who were originally jointly bound with him, except such of them as are at the time of suit dead or beyond the jurisdiction of the court."

At section 118 of the Restatement, under the title "Judgment in an action on a joint promise," we find the

following: "In an action on a joint promise the judgment must be for or against all the defendants who were originally jointly bound unless judgment against one or more of the defendants is precluded by (a) death, or (b) lack of jurisdiction, or (c) contractual incapacity, or (d) a discharge in bankruptcy, or (e) a discharge or barring of the remedy by the Statute of Limitations.

"In any of these cases judgment may be given for or against the others."

The appellants cited, in the petition which was treated as its first brief, three cases, which are as follows: *Burton's Ex'r* v. *Manson* (1925) 142 Va. 500, 129 S. E. 356; *Cannon* v. *Cannon* (1932) 158 Va. 12, 163 S. E. 405, and *Timberlake's Adm'r* v. *Pugh* (1932) 158 Va. 397, 163 S. E. 402.

In their reply brief they refer to these cases with the observation that the appellee has not in his brief discussed or analyzed any of these decisions. In our judgment, it was not necessary for the appellee to have specifically referred to these decisions for the reason that they simply present cases in which the court construed the corroboration statute in the light of the facts that were there existent and they were entirely different from the facts in the case under consideration.

There may have been some corroboration of the witnesses Robertson and Scott, but even so the testimony, taken as a whole, that the scheme was a joint venture is not thereby weakened or impaired. This view is in accordance with the substance of the thing if not with its form.

We affirm the decree of the trial court in all respects except that we hold that the liability against the defendants is a joint one and the decree will be reformed to that extent, and the case is remanded to the court from whence it comes for such further proceedings as may be necessary to effectuate this decision.

*Amended and affirmed and remanded.*