**COLONIAL AMERICAN NATIONAL BANK, Appellee,**

v.

**Robert L. KOSNOSKI, Appellant.**

No. 78–1602.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 3, 1979.

Decided Feb. 11, 1980.

Rehearing Denied May 5, 1980.

Douglas D. Wilson, Roanoke, Va. (Gerald A. Dechow, Martin, Hopkins & Lemon, P. C., Roanoke, Va., on brief), for appellant.

William R. Rakes, Roanoke, Va. (Bruce C. Stockburger, Gentry, Locke, Rakes & Moore, Roanoke, Va., on brief), for appellee.

Before BRYAN, Senior Circuit Judge, and WINTER and MURNAGHAN, Circuit Judges.

ALBERT V. BRYAN, Senior Circuit Judge:

Adjudged liable as the guarantor of two dishonored loans of the Colonial American National Bank at Roanoke, Virginia, Robert L. Kosnoski of West Virginia, appeals the judgment passed in a diversity action June 19, 1978, after a bench trial, by the Federal Court for the Western District of Virginia. In defense, he had pleaded complete release from the guaranty because of the bank's failure, upon his demand, after default in the loans, to sue all solvent parties (includ-

ing sureties, guarantors and endorsers) who reside in Virginia. His stand rests on the exactions imposed upon the bank by the Code of Virginia:[1]

> Surety may require creditor to sue.—The surety, guarantor or endorser, or his committee or personal representative, of any person bound by any contract may, if a right of action has accrued thereon, require the creditor or his committee or personal representative, by notice in writing, to institute suit thereon, and if he be bound in a bond with a condition, or for the performance of some collateral undertaking, he shall also specify in such requirement the breach of the condition or undertaking for which he requires suit to be brought.

Va.Code § 49–25 (1974).

> Effect of failure of creditor to sue.—If such creditor, or his committee or personal representative, shall not, within fifteen days after such requirement, institute suit against every party to such contract who is resident in this State and not insolvent and prosecute the same with due diligence to judgment and by execution, he shall forfeit his right to demand of such surety, guarantor or endorser or his estate, and of his cosureties and their estates, the money due by any such contract for the payment of money, or the damages sustained by any breach of the collateral condition or undertaking specified as aforesaid; but the conditions, rights and remedies against the principal debtor shall remain unimpaired thereby.

Va.Code § 49–26 (1974).

There are no material factual differences here; decision hinges upon the construction of the statutes. Disagreeing with the trial judge's interpretation, we hold that under State law, Colonial should have sued all the other solvent, resident sureties, guarantors and endorsers, and failing to do so, it is precluded from enforcing Kosnoski's guaranty.

By a written contract of June 5, 1975, the bank agreed to lend Edward G. Frye and John Barbour Frye the sum of $372,272 on their note (Term Note), and to extend a $200,000 line of credit to the Frye Building Company to be used as working capital. The loan agreement was subscribed by Frye Building Company, a Virginia corporation, Edward G. Frye, John Barbour Frye, Ruth Townes Frye and Ernestine C. Frye. The agreement demanded that advances made under the line of credit be "personally guaranteed" by the borrowers (Edward G. Frye and John Barbour Frye) and their *wives*. The joinder of the wives in the loan papers is of peculiar import. It is notable because Ruth Townes Frye, wife of John Barbour Frye, was the only party who remained both a resident of Virginia and not insolvent at the time of default.

However, before consummation of the loans, the bank declined to advance $150,000 thereof, having learned meanwhile that Frye Building Company did not have perfect title to one parcel of the property tendered as security.[2] During the summer of 1976, Frye Building Company approached the bank for release of the additional $150,-000. To this end, Kosnoski, an investor in the Company, on August 12, 1976, executed a Guaranty Agreement with the bank and the Edward G. Frye, III, Construction Company, assuring payment of the retained $150,000.

In disbursing the additional funds, the bank prepared a document, signed by John Barbour Frye[3] and Ernestine C. Frye, wife of Edward, consenting to the disbursement of the $150,000 by the bank in August 1976. Through the bank's error, the signature of Ruth Townes Frye, wife of John Barbour Frye, was never obtained. Nevertheless, the bank turned over the $150,000 upon receipt of the Guaranty Agreement.

---

1. Both sections of the statute, Va.Code §§ 49–25 and –26, were amended in 1979, but the changes have no impact on this case.

2. The bank disbursed only $272,000 of the term loan and $150,000 on the line of credit.

3. Edward G. Frye was no longer associated with John Barbour Frye at this point.

On September 30, 1977, the bank wrote Edward and John Frye, their wives, the various corporate entities involved and Kosnoski, notifying them that the makers were in default on the Term Note and line of credit note, and demanding payment on or before October 12, 1977. Otherwise, the letter continued, "our attorneys will be instructed to proceed with collection of these obligations from the makers, guarantors or property securing said notes."

With the loans still in arrears, on December 8, 1977, suit was brought by the bank against Kosnoski alone. Through his attorneys, by letter of February 15, 1978, Kosnoski called upon the bank to sue each maker, guarantor and endorser of the two notes.[4] Although this demand was received by the bank February 16, no suit was ever begun against any of these parties other than Kosnoski.

Since this omission continued for more than 15 days, Kosnoski pleaded it as freeing him, by virtue of Va. Code § 49–26, from responsibility under his guaranty. Undisputed is the fact, it will be recalled, that the only other "party" to the loan "contract who is resident in this State and not insolvent," Va. Code § 49–26, and thus within the embrace of the Virginia statute, is Ruth Townes Frye, the wife of John Barbour Frye. As previously noticed, she bound herself by executing the loan agreement.

Admitting that no case has been decided in Virginia specifically addressing the issue of whether the statute applied to a situation in which a guarantor demands that the creditor sue another surety, guarantor or endorser, the bank adverts to the decision of the Supreme Court of West Virginia in *State v. Citizens' National Bank of Philippi*, 114 W.Va. 338, 171 S.E. 810 (1933). Its discussion traces the Virginia law from its first enactment to the present, but glosses over the point determinative here. The original 1794 statute, 1 Rev. Code of Va. c.

116, § 6, p. 461 (1819) was amended to substantially its present form in 1849 to impose penalties against a creditor who refused "[to] institute suit against *every party* to such contract who is resident in this State and not insolvent . . . ." Va. Code § 49–26. (Accent added.) The insertion of the phrase "every party" would have been entirely unnecessary if the legislature had intended that the guarantor could only demand suit against the principal. We, therefore, cannot accept the West Virginia view, and find Kosnoski's claim of discharge is unimpeachable.

The order on appeal will be reversed, and the action remanded to the District Court with directions to enter judgment for the appellant with costs.

Vacated with Directions.

MURNAGHAN, Circuit Judge, dissenting:

It concerns me to dissent, but my understanding of what the Virginia courts would do in this diversity action differs from that of my fellow panel members. The pertinent rules of suretyship and my perception of the proper reading of the applicable Virginia statutes lead me. to a conclusion other than the one the majority has reached.

The case involved a term loan agreement, a loan guaranty agreement, and two notes thereunder, all executed on June 5, 1975. Those documents together provided for: (1) borrowings from Colonial American National Bank ("Bank") by Edward G. Frye, III ("Edward") and John Barbour Frye ("John") in the aggregate amount of $372,-272, with $122,272 of the total amount to be relent by them to a partnership, Frye Building Company ("Partnership"), and $250,000 to be relent by them to a Virginia corporation also named Frye Building Company ("Virginia Corporation"); and (2) borrowings from the Bank by the Virginia Corporation in the amount of $200,000.

---

**4.** In passing, mention is made of the bank's argument that this notice was not in compliance with the Virginia statute because it was not directed to the bank but, instead, to its attorneys. However, in answer to his pretrial request for admissions, the bank conceded that "Plaintiff had received Defendant counsel's letter of February 15, 1978." Further, in the trial court's opinion was a finding that "the defendant made a written request" of the bank to "institute suit against all parties who made, guaranteed or endorsed the original notes."

The term loan agreement covered in detail the terms of the first of the transactions, and also provided:

In addition to the above term loan, Bank will extend a $200,000 line of credit to the Company to be used as working capital at the best commercial rate then in effect plus 1%. . . . All advances made under this line of credit shall be personally guaranteed by Borrowers, Borrowers' wives, and the Partnership. Loans under this line of credit shall be secured by the deed of trust set forth in Exhibit B and governed by the terms of this Agreement.

The Borrowers were defined in the term loan agreement as Edward and John. The term loan agreement identified the parties thereto as Edward, John, the Partnership, the Virginia Corporation, and the Bank. The wives of Edward and John [1] were not named as parties to the term loan agreement, the sole reference to them being found in the language quoted above requiring them to guarantee advances under the $200,000 line of credit to the Virginia Corporation. At the foot of the term loan agreement, following the signatures by or on behalf of the named parties, Ruth and Ernestine signed. No descriptive language appeared in the vicinity of their signatures. They signed in an order inverse to the order in which their respective husbands signed, thereby generating some subsequent confusion.

The term note covering the $372,272 advance identified John and Edward as the makers and borrowers and the Bank as the lender. Edward and John signed as makers. In its body the note provided for waiver of presentment, demand, notice of dishonor and all exemptions by the borrowers and "every endorser and guarantor." Appended at the foot of the note was a legend: "The undersigned hereby unconditionally guarantee the payment of the principal and interest of this note." Following the legend appeared signatures as guarantors by

or on behalf of the Virginia Corporation, the Partnership ("By" Edward and John as partners), Ruth and Ernestine.

The loan guaranty agreement refers to obtention of credit from the Bank by the Virginia Corporation as an objective and bears signatures by or on behalf of the Partnership (for whom Edward signed as partner), John, Edward, Ruth, and Ernestine.[2]

The demand note in the amount of $200,-000 was executed on behalf of the Virginia Corporation as borrower and maker. Following such execution there appeared the legend "The undersigned hereby unconditionally guarantee the payment of the principal and interest of this note," to which were subscribed the signatures as guarantors of Edward, John and the Partnership (by Edward and John as partners). Neither Ernestine nor Ruth signed the note as makers or as guarantors. The parties have not raised any point concerning the absence of the wives' signatures as guarantors presumably because the wives, as guarantors, did sign the related loan guaranty agreement, and also signed at the foot of the term loan agreement, which stated that they would personally guarantee advances to the Virginia Corporation.

Although the June 5, 1975 papers constituted evidence of loans aggregating $572,-272, the Bank in fact held back $100,000 of the amount to be lent to Edward and John and $50,000 of the amount to be lent to the Virginia Corporation because of a title defect with respect to one property which was to be pledged as security.

A year later, to obtain advance by the Bank of the withheld $150,000, Edward G. Frye, III Construction Company ("West Virginia Corporation") and Robert L. Kosnoski on August 12, 1976 entered a guaranty agreement (dated for identification June 28, 1976) with the Bank in which the West Virginia Corporation was referred to as

---

1. Edward's wife was Ernestine C. Frye ("Ernestine"); John's wife was Ruth Townes Frye ("Ruth").

2. Actually the name appearing is "Carol C. Frye", presumably a variant of Ernestine C. Frye.

"Company." The recital in the guaranty agreement was:

> Whereas, Kosnoski and Company desire to guarantee a portion of the indebtedness evidenced by a note dated June 5, 1975, in the amount of Three Hundred Seventy-two Thousand Two Hundred Seventy-two Dollars ($372,272.00) made by Edward G. Frye, III, and John Barbour Frye and a note dated June 5, 1975, in the amount of Two Hundred Thousand Dollars ($200,000.00) made by Frye Building Company, a Virginia corporation in order to induce Colonial American to advance monies to Frye Building Company, a Virginia corporation.

Pertinent provisions in the agreement read:

> 1. Kosnoski and Company guarantee the full and prompt payment to Colonial American of the indebtedness evidenced by the aforementioned notes dated June 5, 1975 and every balance and part thereof, whether now owing or due, and which may hereafter, from time to time, be owing or due, and howsoever heretofore or hereafter created or arising, to the extent of One Hundred Fifty Thousand and 00/100 Dollars ($150,000.00), and Kosnoski and Company also agree to pay in addition thereto, all costs, expenses and reasonable attorney's fees at any time paid or incurred endeavoring to collect said indebtedness and related to enforcing this instrument.

> \*　\*　\*　\*　\*　\*

> 3. The granting of credit from time to time by Colonial American to Frye Building Company, a Virginia Corporation; Frye Building Company, a Virginia Partnership; Edward G. Frye, III; John Barbour Frye; or Edward G. Frye, III, Construction Company, a West Virginia Corporation, in excess of the amount of this guaranty without notice to Kosnoski or Company, is hereby authorized and shall in no way affect or impair this guaranty.

> 4. Authority and consent are hereby expressly given Colonial American from time to time, and without any notice to Kosnoski or Company, to give and make such extensions, renewals, indulgences, settlements and compromises as it may deem proper with respect to any of the indebtedness, liabilities, and obligations covered by the notes aforesaid and this guaranty, including the taking or releasing of security and surrendering of documents.

It is to be emphasized that the August 12, 1976 guaranty agreement made absolutely no reference to Ruth and Ernestine. Nor did either Ruth or Ernestine sign, or otherwise associate herself with, the guaranty agreement. At Kosnoski's request, John and Ernestine[3] did execute a letter dated August 3, 1976 addressed to the Bank stating:

> We realize you intend to complete the funding of two (2) loans evidenced by notes dated June 5, 1975 in the face amounts of $200,000.00 and $372,272.00. We recognize that our liability on those two notes will be increased by this funding and we consent to that increase in our liability.

> We realize you are relying on this letter in making your advance and consent to that reliance.

When hard times came, and the borrowers on the two loans defaulted, of the principal borrowers and the guarantors, only Ruth was a solvent Virginia resident. Failure of the Bank to sue her after Kosnoski's request that it do so is the foundation of the majority's conclusion that the Virginia statute directed a forfeiture of the Bank's rights against Kosnoski.

At the outset of the discussion of applicable legal principles, it will be well to point to a terminology consideration which, if not recognized, could lead to imprecision or confusion. The parties have designated the two wives as "guarantors." In this dissenting opinion will be found frequent refer-

[3] Ernestine being the wife of Edward, manifestly there was a mixup, with the intention having been that John's wife, Ruth, rather than Ernestine, the wife of Edward, sign. The significance of the August 3, 1976 letter is not, for our purposes, affected by the confusion of names.

ences to the law of suretyship. There are indeed differences between a guarantor and a surety which may on occasion have significance. They relate, primarily, however, to whether, insofar as the obligation to the creditor is concerned, the liability is primary, usually joint with that of the debtor,[4] or only secondary, with a condition precedent to liability the failure of the debtor to perform.[5] The actual nature of the relationship, not the nomenclature of the parties, is what controls.[6] For our purposes, the distinction is of limited significance for, in most aspects of the matter, we deal with a factual situation in which the condition precedent to a guarantor's liability, default by the debtors, had occurred.[7] Thereafter the terms "guarantor" and "surety" become synonymous, and interchangeable.[8]

It is an accepted principle of suretyship that there are two distinct contractual relationships, one between the creditor and the borrower, usually referred to as the principal, the other between the creditor and the person [9] who agrees that the obligation from the principal to the creditor shall be performed and who undertakes to perform if the principal does not. *Bourne v. Board of Supervisors of Henrico County,* 161 Va. 678, 684, 172 S.E. 245, 247 (1934) approves and applies the following language:

> Generally a guaranty relates to the payment of a sum of money or the collectability thereof, . . . Being a col-

**4.** In which case, the relationship is one of suretyship. Simpson, *Handbook on the Law of Suretyship* (1950) § 14, p. 16. *See Piedmont Guano & Mfg. Co. v. Morris,* 86 Va. 941, 944–45, 11 S.E. 883, 884 (1890); *Phoenix Ins. Co. v. Lester Bros., Inc.,* 203 Va. 802, 807, 127 S.E.2d 432, 436 (1962).

**5.** Then the relationship is one of guaranty. *Id. Cf. Cobb v. Vaughan & Co.,* 141 Va. 100, 108, 126 S.E. 77, 81 (1925).

**6.** *B. F. Goodrich Rubber Co., Inc. v. Fisch,* 141 Va. 261, 267, 127 S.E. 187, 188–89 (1925).

**7.** There is nothing in the June 5, 1975 term loan agreement, loan guaranty agreement and notes to intimate an intention of those designated as "guarantors" to do more than obligate themselves to pay if, but only if, the borrowers, Edward, John and the Virginia Corporation were to default. An "unconditional" guaranty signifies that, as a guaranty, it is subject to no conditions, not that the condition precedent of default by the debtor, which is essential to its nature as a guaranty in the first place is eliminated. *See Ives v. Williams,* 143 Va. 855, 859, 129 S.E. 675, 676 (1925) ("The guaranty . . . is unquestionably an absolute guaranty. . . . [T]he performance of that act is guaranteed by Herbert without any condition of any character being annexed to it. . . . Immediately upon the failure of Ives to perform his contract . ., there has been failure of performance of the act which Herbert has guaranteed should be performed, and his liability for the failure to perform arises at once and unconditionally. An absolute guaranty is . . . one by which the guarantor unconditionally promises payment or performance of the contract on default of the principal debtor . . ."). Otherwise, the commonly employed phraseology "unconditional guaranty" would have no meaning. It would constitute a total contradiction in terms.

*See* Stearns, *The Law of Suretyship* (James L. Elder 5th ed., 1951), § 4.5, p. 64: "Guaranties may also be classified as absolute and conditional. An absolute guaranty is an unconditional undertaking on the part of the guarantor that he will pay the debt or perform the obligation *immediately upon the debtor's default.*" (Emphasis supplied).

The Bank's counsel was responsible for preparing the papers, and presumably chose the word "guarantor" with an eye to its exact legal meaning, especially since the alternative "surety" would have provided, in theory at least, greater protection for the Bank. *See Restatement, Contracts* §§ 234, 235(b); *Amick v. Baugh,* 66 Wash.2d 298, 304, 402 P.2d 342, 346 (1965).

The August 3, 1976 letter of John and Ernestine does refer to their liability on the two notes, but a guarantor's conditional liability would as much meet the description as would a true surety's unconditional liability.

**8.** *Restatement, Security* § 83, Comment g (1941). Stearns, op. cit. n. 7, § 1.1, p. 1: "Suretyship may be defined as a contractual relation whereby one person engages to be answerable for the debt of another. Within this broad definition fall contracts of guarantors and indorsers, as well as those of sureties in the restricted sense." Simpson, op. cit. n. 4, § 14, p. 16: "Since in most cases the legal consequences of suretyship and guaranty are the same, in this book the word surety will be used in the broad sense to include both surety and guarantor. Where the fact that a collateral promisor's undertaking is conditioned upon the principal's default becomes important to liability, the word guarantor will be used."

**9.** Designated the surety. Stearns, op. cit. n. 7, § 1.4, p. 3.

lateral engagement for the performance of the undertaking of another, it imports the existence of two different obligations, one being that of the principal debtor and the other that of the guarantor. If there is no obligation on the part of the principal, there is none on the guarantor. But the debtor is not a party to the guaranty, and the guarantor is not a party to the principal obligation. The guaranty is a separate and independent contract, involving duties and imposing responsibilities very different from those created by the original contract to which it is collateral. The fact that both contracts are written on the same paper or instrument does not affect their separate nature. The separate nature status of the guaranty contract has been acknowledged recently in *American Industrial Corp. v. First & Merchants Nat'l Bank*, 216 Va. 396, 398, 219 S.E.2d 673, 675 (1975) (". . . a guaranty is a separate, collateral and secondary undertaking to answer for the debt of another in event of his default."). Judge Bryan, in a case arising under Virginia law has stated: "The stubborn fact is that the surety met the completion or performance costs without reference to Zoby's separate and several liability therefor." *Zoby v. United States*, 364 F.2d 216, 219 (4th Cir. 1966).[10] While it is customary for the two related contractual undertakings to be coalesced in the same instrument, such an arrangement is by no means necessary. The two separate contracts may be executed at different times. Stearns, op. cit. n. 7, § 2.1, p. 8.

In addition to the two contracts between (a) the principal debtor and the creditor and (b) the creditor and the surety, there is a third contract, one of indemnification, between the principal debtor and the surety, under which full reimbursement for all amounts paid by the surety is required. *E. g. Dickenson v. Charles*, 173 Va. 393, 400, 4 S.E.2d 351, 353 (1939) ("There is an implied contract of indemnity between the principal and his surety, which obliges the former to reimburse the latter who has paid his debt;"); *Aetna Casualty & Surety Co. v. Whaley*, 173 Va. 11, 15, 3 S.E.2d 395, 396 (1939) ("The surety who pays the debt has a right of action against the principal on an implied contract for exoneration.")

Where a suretyship arrangement exists there may, of course, as in the present case, be more than one person who has obliged himself or herself as surety. Most frequently, where there are several sureties their relationship *inter sese* is one of cosuretyship. There is a presumption that, when two or more persons are sureties on the same instrument they are cosureties. Stearns op. cit. n. 7, § 11.20, p. 486. The presumption operates even though the several sureties are bound by different instruments executed at different times and without the knowledge of each other. 74 Am.Jur.2d (Suretyship § 6), p. 14; Restatement *Security* § 144, Comment a. *Cf. Harrison v. Lane*, 5 Leigh (32 Va.) 414, 418, 27 Am.Dec. 607, 609 (1834) ("If the sureties in the second bond were bound for the same thing for which the sureties in the first bond were bound, they would be liable for contribution, although their engagement were made at a subsequent time by a different instrument, and even without the knowledge of the first bond"); *Rosenbaum v. Goodman*, 78 Va. 121, 127 (1883). Several

10. Stearns, op. cit. n. 7, § 4.1, p. 59: "Since the contract of guaranty is collateral, a primary or principal obligation must exist to which it is secondary, as without a principal debt there can be no guaranty. Each contract is separate despite the fact that both may be written on the same instrument." *Id.* § 1.1, p. 1: "The contract of all three [a guarantor, an indorser and a surety in the restricted, non-combining sense], however, is accessory to the contract of the principal debtor. . . . It is of the essence of the surety's obligation that there be a subsisting valid obligation of a principal debt-

or." Simpson, op. cit. n. 4, § 6, p. 10: "Thus a contract of guaranty is an obligation in form and substance to answer for another's default. It is collateral, secondary and expressly conditioned upon breach by the principal debtor. The debtor is not a party to the guaranty, and the guarantor is not a party to the principal obligation. Although the same consideration (of detriment to the promisee creditor) may support both the promise of the guarantor and of the principal debtor, yet they are independent obligations."

sureties may be cosureties where bound for different amounts if a final solution is a sharing of the burden. *Id.*[11]

Cosureties are equally bound to answer for the same duty of the principal and, between themselves, should share any loss caused by the default of the principal. Restatement *Security* § 144. *Inter sese*, the obligations of cosureties are limited to contribution by each of his proportionate share of the principal's defaulted indebtedness. Simpson, op. cit. n. 4, § 46, pp. 198, 204. *Cf. Houston v. Bain*, 170 Va. 378, 389, 196 S.E. 657, 662 (1938); *Aetna Casualty & Surety Co. v. Whaley*, 173 Va. 11, 15, 35 S.E.2d 395, 397 (1939). Such right of contribution "is based solely on the implied promise growing out of the equitable relations which the sureties, as jointly bound, bear to each other, and not upon the written contract by which they became sureties." *Mann v. Bradshaw's Adm'r*, 136 Va. 351, 377, 118 S.E. 326, 334 (1923). Payment by one cosurety of more than his proportionate share is a necessary prerequisite to his proceeding for contribution against his other cosureties. *Young v. Bowen*, 131 Va. 401, 407, 108 S.E. 866, 868 (1921).

Contrasted with cosuretyship is the relationship of subsuretyship, in which one surety is entitled to have another surety or sureties bear the entire burden of the principal's default. Restatement *Security* §§ 144 and 145. As Comment a to § 145 points out:

Where there are two sureties, the usual relation is cosuretyship, but by agreement between them or because of the equities of the situation, one of them as between themselves, may be liable for the entire

loss caused by the default of the principal and hence not a cosurety. Where this is true, there are two interlocking tripartite relationships. The creditor has two sureties for his principal, but between the sureties one of them is a principal and the other a surety, that is, the former rather than the latter should perform. The former is a surety as to the principal debtor but is a principal as to the other surety. In view of the dual position of the former, he is called the principal surety. The surety to whom the principal surety is in the relation of principal is the subsurety.

The principal surety is the one who has the whole duty of performance. Restatement *Security* § 145. "As to the subsurety, each of the other obligors is a principal, and each owes a duty to reimburse him, if he is required to pay." Simpson, op. cit. n. 4, § 12, p. 15.[12] To establish that subsuretyship exists, usually the person claiming subsurety status must have expressly conditioned his undertaking "on nonperformance by the principal *and the other sureties*" (Emphasis supplied). Simpson, op. cit. n. 4, § 12, p. 14.

With respect to the problem with which we are here presented, the correct designation of the several sureties is important. It can hardly be questioned that the relationship is one of cosuretyship, the more customary one. Kosnoski and the West Virginia Corporation had made absolutely no undertaking to be responsible for the obligations of the original cosureties (Edward, John, the Partnership, the Virginia Corporation,[13] Ernestine and Ruth). Nor have

11. *Claybrook v. Scott*, 1 Va.Dec. 316, 319 (1878): "The right to contribution is not affected by the co-securities being bound jointly or severally; or by the same or different instruments; or at the same or different times; or for the same or different amounts, except that when the amounts are different, a co-security cannot be required to contribute beyond the sum for which he was bound, nor does it matter whether the co-securities were aware of their being such."

12. If there are two or more sureties, they are cosureties, rather than in the principal sure-

ty/subsurety relationship, in the absence of agreement or stipulation to the contrary or of duties or equities imposing the principal liability on one of them. Restatement *Security* § 146.

13. It is confusing that Edward, John and the Virginia Corporation each is both principal debtor and cosurety. The reason, of course, is that there were two loans. On one Edward and John were principal debtors and the Virginia

they made nonperformance by the original cosureties a condition of their undertaking.[14] To the contrary, their August 12, 1976 joint guarantee runs only to the obligations as principal debtors of Edward, John and the Virginia Corporation. Edward, John and the Virginia Corporation are the only principals to which the guarantee of Kosnoski and the West Virginia Corporation pertains. Nowhere appears an undertaking by those who became cosureties on June 5, 1975 to indemnify Kosnoski or the West Virginia Corporation.[15] No June 5, 1975 cosurety gave any indication that, as between them, he would accept entire responsibility and indemnify the others, or, conversely, seek indemnification. "No one incurs a liability to pay a debt or perform a duty for another unless he expressly agrees to be so bound, for the law does not create relations of this kind by mere implication." Stearns, op. cit. n. 7, § 2.2. p. 9.

Consequently, even without the application of the presumption of cosuretyship, status of subsuretyship for Kosnoski and the West Virginia Corporation is entirely negatived. The presumption only fortifies the already inevitable conclusion. There is absolutely no foundation for a determination that, as between the first tier cosureties and the second tier there was a relationship of principal and subsurety. Kosnoski had no contractual basis for calling on any of the first tier cosureties to make him whole for any amount paid out by him by reason of the default of his principals (Edward, John and the Virginia Corporation). His rights against the cosureties were rights of *pro rata* contribution growing out of the status of cosuretyship, not rights of full reimbursement provided by contract. Rights of full reimbursement would depend on a contractual relationship between Kosnoski and the original cosureties, and no such contract was entered.[16]

Corporation a cosurety. On the other the Virginia Corporation was the principal debtor and Edward and John cosureties. Ernestine and Ruth were simply cosureties for both loans.

**14.** Contrast *Harrison v. Lane*, 5 Leigh (32 Va.) 414, 418, 27 Am. Dec. 607, 609 (1834), where the second set of sureties bound themselves "only as the sureties in the first bond should fail to make good."

**15.** There was a dispute at the trial over whether the August 3, 1976 letter from John and Ernestine to the Bank, acknowledging that advance of the $150,000 theretofore withheld would increase their liability on the two notes, was obtained at Kosnoski's insistence or at the insistence of the Bank. If we assume for present purposes that Kosnoski insisted on the letter, it still did nothing to establish any relationship between those who signed it and Kosnoski. It concerned only the relationship between the Bank and those who subscribed to it. Furthermore, were it, for sake of argument, deemed to create a subsuretyship relationship, the relationship would exist only between Kosnoski and those who signed it, John and Ernestine. There is nothing in the record to suggest that non-signature by Ruth was conscious on her part, an element of a scheme to mislead Kosnoski into believing she was entering a subsuretyship arrangement with him. So, however the August 3, 1976 letter is viewed, it created no subsuretyship between Ruth, as principal, and Kosnoski, as subsurety.

Kosnoski also has contended that the Bank's failure to obtain Ruth's signature, despite his claimed insistence on having her bound, was a reason independent of Va.Code § 49–26 for relieving him of his guaranty undertaking to the Bank. The district court gave the contention short shrift. The judge found that the letter of August 3, 1976 was procured for the benefit of its addressee, the Bank, and not for the benefit of Kosnoski. The evidence was in conflict and the finding was not clearly erroneous. Furthermore, even if Kosnoski was the one insisting on the undertaking, it was totally superfluous, and of no operative effect. Ruth was liable as guarantor for the full amounts of $372,272 and $200,000 by reason of the June 5, 1975 documents. Another undertaking to like effect would have been repetitive and would have accomplished nothing. The failure to obtain it, therefore, was of no consequence.

**16.** As a consequence, Kosnoski's maximum rights to recover against Edward and John extended to $100,000 under the loan on which they were the principal borrowers which was guaranteed to the extent of $100,000 by Kosnoski, but to only $2/7$ of $50,000 or $14,286 under the loan to which, to the extent of $50,000, Kosnoski, the West Virginia Corporation, Edward, John, the Partnership, Ernestine, and Ruth were cosureties of the borrower, the Virginia Corporation. Similarly against the Virginia Corporation, Kosnoski's maximum right to recover was $50,000 plus $1/6$ of $100,000 or $16,667. Kosnoski's maximum right of recovery against Ruth was $7,143 on the $200,000 loan (of which he had guaranteed $50,000) and $16,667 on the $372,272 loan (of which he had guaranteed $100,000), a total of $23,810.

In short, while temporally there were two tiers of sureties, in all other respects they were coalesced into a single group of cosureties. As a consequence, no one of them had a right to seek from the others payment of anything more than his or her proportionate share of the amount of any loss to the Bank by virtue of a default by any of the principals (here Edward, John and the Virginia Corporation).

In resumé, in a relationship such as the one here presented there are four separate and distinct contracts:

(a) The express contract between the principal debtor and the creditor, in which the undertaking is to pay the entire indebtedness;

(b) The express contract between the surety and the creditor, in which the undertaking again is to pay the entire indebtedness;

(c) The implied contract of indemnification between the principal debtor and the surety, in which the undertaking to reimburse once again relates to the entire indebtedness; and

(d) The implied contract of contribution between the cosureties, in which the undertakings are only to pay pro rata shares of the entire indebtedness.

If this were a subsuretyship situation, we could speak of a fifth contract, between principal surety and subsurety, but it would, in fact, be but a variant of the contract classified under the heading (c). With respect to it, the principal surety would be the principal debtor, and the subsurety the surety. Of course, in that situation, once again the entire indebtedness would be covered.

If the matter of extent of recovery against cosureties arose in equity, rather than at law, the proportions would be adjusted to eliminate from the denominator all insolvent or nonresident cosureties. *Cooper v. Greenberg*, 191 Va. 495, 501, 61 S.E.2d 875, 878–79 (1950). However, any adjustment would still leave at least two cosureties, Kosnoski and Ruth, so Ruth's obligation to Kosnoski could never equal the full aggregate amount of the two indebtednesses.

When these considerations are appreciated, it becomes evident that the Virginia statute created no responsibility on the part of the Bank, as creditor, on demand of one cosurety, to sue another cosurety. The interrelated statutory provisions found at Va. Code §§ 49–25 and 49–26 contemplate only the creation of a right in the surety to require the creditor to sue the surety's principal. Section 49–25 creates the right in "[t]he surety, guarantor or endorser . . . of any person bound by any contract" to "require the creditor . . . to institute suit thereon." [17] One cosurety is simply not the surety of another cosurety. To a cosurety, the only person bound on any contract to whom he or she stands in the relationship of surety, guarantor or endorser is the principal debtor.

In the instant situation, as cosureties, Kosnoski and the West Virginia Corporation were sureties of the principals, i.e., Edward, John and the Virginia Corporation. They were not, however, sureties of their fellow cosureties, Ruth, in particular. The contracts by which those principals were bound were the one creating the obligation to pay the Bank $372,272 in the case of Edward and John and the one creating the obligation to pay the Bank $200,000 in the case of the Virginia Corporation. Those contracts were separate and distinct from the contracts of guaranty between the Bank and the cosureties obliging them to make good any loss resulting from default by the principal debtors. The principal debtors, *qua* principal debtors, were not bound by such guaranty contracts.[18] The guaranty contracts, therefore, did not fall within the statutory reference to any contract on which a principal is bound.

17. I.e., on the contract by which the surety's principal is bound.

18. Edward's and John's liabilities under the guaranty were only as sureties for the Virginia Corporation with respect to the $200,000 loan, not as principal debtors. The Virginia Corporation's liability under the contract of guaranty similarly was exclusively as surety for Edward and John on the $372,272 loan.

The right to require suit under § 49–25 is the right to require the creditor to institute suit on the very contract by which the principal is bound. It says nothing about suit on a collateral agreement, not directly involving the principal, made between the creditor and the surety or sureties. Section 49–26, which creates the forfeiture for failure to bring suit, speaks in terms of suit "against every party to such contract." The language "such contract" must have an antecedent and obviously refers to the contract described in § 49–25, i. e., the contract binding the principal debtor.

The cosurety is simply not a party to that contract,[19] and, therefore, not within the statutory description of "every party to such contract." It is, therefore, impossible to read the statutes as creating the right in one cosurety to require the creditor to bring suit against another cosurety, on pain for failure to do so of losing any right of recovery against the cosurety making the requirement.

The reason why the statute would not seek to achieve such a result is evident. The cosurety only has a claim for contribution against another cosurety in the amount of his proportionate share of the amount of the indebtedness not repaid by the debtor to the creditor. The amount which would be recoverable from the cosurety could, therefore, only be a fraction of the entire indebtedness. It would be extremely unreasonable for a statute to contemplate discharge of the entire indebtedness for failure to institute suit against someone who, vis-a-vis the person making the demand on the creditor to sue, would only be liable for a portion thereof. The Virginia legislature could hardly have contemplated discharging Kos-

noski's $150,000 aggregate guaranty because the Bank failed to sue Ruth, whose maximum contribution exposure to Kosnoski was $23,810.[20]

The inappropriateness of applying the statute to the facts of this case is highlighted if we consider what the situation would have been had one of the original cosureties, Ruth, for example, called upon the Bank, as creditor, to sue her cosurety, Ernestine, or her cosurety Kosnoski. The guaranty agreement made by Kosnoski was clearly separate and distinct from the June 1975 instruments creating the primary obligations. The guarantees of the first tier of cosureties, Ernestine and Ruth in particular, while annexed at the foot of those documents, also created separate and distinct obligations from the primary indebtednesses themselves. No cosurety was a "person bound" by the contracts creating the indebtednesses to the Bank. They were bound by their separate and distinct guaranty agreements. That the statute did not extend, by its terms, to such separate and distinct contracts is obvious.

The majority rests its decision principally on the duty imposed on the creditor, by Va.Code § 49–26, once a surety has required that suit be brought, to institute suit "against *every party to such contract* who is resident in this State and not insolvent." The statutory language manifestly deals with the situation where there are multiple principals, as is the case here with the $373,272 term note of which both Edward and John were makers. Both of them, if Virginia residents and solvent, would have had to have been sued to comply with the "every party" requirement. However, the lan-

---

**19.** *See* n.10 *supra. Bourne v. Board of Supervisors of Henrico County, supra*, is precise on the point: " . . . the guarantor is not a party to the principal obligation."

**20.** Even less could the legislature have contemplated discharging, as to all the cosureties, including Edward, John, the Partnership, the Virginia Corporation, Ernestine and Ruth, their liabilities, as guarantors, for $372,272 and $200,000. Yet that would be the consequence of the majority's decision, for failure to comply with Kosnoski's request, if the statute indeed

extended to him the right to require suit against his cosureties, would also, under § 49–26, lead to forfeiture of the Bank's right to recover from "his cosureties and their estates, the money due by any such contract." "The effect of failure to institute suit against every party to such contract who resides in this state and is not insolvent, after notice, is an absolute forfeiture of all claims against every surety upon the contract." *Edmonson v. Potts' Administrator*, 111 Va. 79, 82, 68 S.E. 254, 256 (1910).

guage "every party to such contract" means just what it says; it does not mean "every party" to another contract or other contracts which happen to be spelled out in the same set of papers as "such contract" (the contract by which the principal or principals are bound).[21]

Kosnoski happened to be a non-resident of Virginia, and had already been sued by the Bank when his demand was made. Suppose, however, a demand that suit be filed made under the statute by a resident cosurety before Kosnoski himself had been sued. Not a party to the agreement creating the indebtedness from the principal to the creditor, such cosurety would, nevertheless, on the approach taken by the majority, be among the group described in the statute as "every party to such contract." So the creditor would have to be careful to sue the requiring cosurety himself, as well as the principal and other cosureties, or else be met by a claim that the cosurety who demanded that suit be brought was relieved of his obligation. *Cf. Moore v. Peterson,* 64 Iowa 423, 20 N.W. 744 (1884), where the surety's demand that suit be brought was deemed defective because it did not call for himself to be sued.

Further circumstances can be imagined to demonstrate the error in the majority's reading of "every party to such contract." Suppose a single document covering separate loans to numerous different individuals. A bank might so contract with all the members of an amateur baseball team or of a fraternal society, in circumstances where liability would be individual and several, not joint. A surety for one of the borrowers could hardly, under the statute, escape liability if the bank, following demand, sued only the one borrower who was in default, instead of suing also all the other nondelinquent borrowers, and any sureties for them.

The relationship of Ruth and Kosnoski was not one of subsuretyship. Only if it had been, however, could the result have been as the majority has concluded. Because in a subsuretyship situation Ruth would be Kosnoski's principal, she would have had to have been sued, or the statutory forfeiture would have operated.[22] The

**21.** The statute creates a trap by using the phrase "every party to such contract" in circumstances where the contract to which reference is intended, i.e., the contract between the creditor and *the surety's principal*, is intertwined, often in the same document, with the separate and distinct contract between the creditor and *the surety himself*. The abstruse principles of suretyship are apt to elude the reader of the statute, who reasonably concentrates on "every party," but pays insufficient attention, in circumstances of this nature, to "such contract." The majority are not the first to misread "such contract" as extending to the agreement between creditor and surety, rather than to the agreement between the creditor and the debtor, the principal of the surety. The court in *Edmonson v. Potts' Administrator,* 111 Va. 79, 68 S.E. 254 (1910) fell into precisely the same trap in a case in which a cosurety sought to compel the creditor to sue a fellow cosurety. The point apparently was never made to the court that the statute did not extend to such a demand to sue. The consequence of the misreading of the statute was but harmless error, however, for the court held that the communications on which the cosurety relied did not, in any event, constitute sufficient notice under the statute. The *Edmonson* opinion emphasizes that the only question decided was whether the notice was sufficient. So the case constitutes

no authority contrary to the conclusion I have reached.

**22.** In those circumstances, the subsurety agreement between Kosnoski and Ruth would relate to the guaranty arrangement by which Ruth bound herself to the Bank to remedy any default by the borrowers (Edward, John and the Virginia Corporation). Kosnoski could under § 49–25, as surety for Ruth, have called on the Bank to institute suit thereon (rather than on the contract between the Bank and the borrowers). The February 15, 1978 demand letter sent by Kosnoski's counsel to counsel for the Bank would, in such circumstances, have satisfied the statute's insistence that the demand specify that suit be sought on the contract binding the surety's principal, for the letter demanded that suit be instituted, not only against the borrowers, but against the guarantors as well.

The applicability of the statute would clearly have been intended by the Virginia legislature in such circumstances, since Kosnoski, as subsurety, would have at risk the entire $150,000 for which Ruth, as a principal under the subsuretyship arrangement, would have indemnified him (not merely the $23,810 which, as cosurety, Ruth, as an absolute maximum, might be liable to contribute to Kosnoski if he completely fulfilled his surety undertaking to the Bank). Kosnoski evidently would fall with-

application of the statute would make sense, for Ruth would, as principal surety to Kosnoski's subsurety, have indemnified him with respect to the entire liability. I submit that it may have been an unexpressed, yet erroneous assumption of subsuretyship between Ruth and Kosnoski which led my colleagues on the panel into what I perceive to be error.[23]

The result I would reach purely from the plain and unambiguous language of the Virginia statutes and principles of suretyship is supported by additional considerations:

1. The West Virginia case of *State v. Citizens' National Bank of Philippi*, 114 W.Va. 338, 343–44, 171 S.E. 810, 812 (1933) concluded that the substantially identical West Virginia statute did not apply to require the creditor to bring suit against a cosurety. The decision in the absence of direct Virginia authority is particularly apposite, for it follows Virginia authorities under the Virginia statute, which was the predecessor of the West Virginia enactment. The West Virginia Supreme Court of Appeals held:

> It is therefore readily seen that this court follows the trail of the decisions made by the courts in Virginia. So we feel constrained to hold that the position taken by the state as to the interpretation of this statute is correct and that it is limited to the protection of the sureties against any infringements of rights which the creditor or the sureties may have against the principal debtor; or, in other words, the statute was not designed to give protection to a surety against another surety.

The Virginia cases cited in *Philippi* had emphasized that §§ 49–25 and 49–26 were concerned solely with protection of the equity of the surety *"against his principal."* There, as here, the fact that the cosureties were not principals so far as the demanding cosurety was concerned compelled the conclusion that the statute did not apply.[24]

---

in the protective scope of the statute if there were delay in proceeding against Ruth, since the delay might deprive him of a reimbursement source for the entire $150,000.

**23.** Even if there had been a subsuretyship, however, it appears that, nevertheless, in the particular circumstances of this case, Kosnoski has waived his rights under §§ 49–25 and 49–26. His guaranty agreement of August 12, 1976 expressly consented to extensions, . . . indulgences, . . . and compromises by the Bank "with respect to any of the indebtedness, liabilities and obligations covered by the notes aforesaid and this guaranty." A decision by the Bank not to collect from Ruth by suit or otherwise would be an indulgence. Simpson, op. cit. n.4, § 42, p. 175. While we need not address the question of whether the benefit of the statute may be waived by contract, if it were necessary to do so, the answer is clear that a waiver is valid and enforceable. As held in *J. R. Watkins Co. v. Fricks*, 210 Ga. 83, 85, 78 S.E.2d 2, 4 (1953):

> The right created by the legislature, as embodied in § 103–205 of the Code of 1933, was established solely for the benefit of one who has become surety for another, and such surety may therefore waive it without injuring others and without affecting the public interest; and a waiver of the right, as thus established, does not in any way interfere with the preservation of public order or of good morals.

*See* Annotation, Waiver by Surety Agreement of Benefit of Rule which Releases Surety in Event of Obligee's Failure to Comply with Surety's Demand that He Proceed Against Principal, 89 A.L.R. 570; *Austad v. United States*, 386 F.2d 147, 150 (9th Cir. 1967); *United States v. Crain*, 589 F.2d 996, 1001 (9th Cir. 1979); *Commonwealth ex rel Department of Justice v. National Surety Co.*, 310 Pa. 108, 164 A. 788 (1932); *Owensboro Savings Bank & Trust Co.'s Receiver v. Haynes*, 143 Ky. 534, 136 S.W. 1004 (1911).

Nor need we consider whether Kosnoski's delay in resorting to the statute after the Bank's notice on September 30, 1977 of default on both loans, until February 15, 1978, over two months after the Bank sued him on December 8, 1977, created any waiver or estoppel. The circumstances do suggest, however, that the demand that guarantors be sued was not made in fulfillment of the statutory purpose: namely, to protect a surety from having to stand by helplessly while someone else, who could minimize or eliminate the surety's secondary liability, wastes his assets. *Wright's Administrator v. Stockton*, 32 Va. (5 Leigh) 66, 68 (1834). Rather Kosnoski's action appears intended simply as a strategic ploy to set up a claim of release for noncompliance with the statute.

**24.** It may merit mention that the court in *Philippi* sensibly recognized the right of one cosurety, such as Kosnoski, to proceed *in equity*

The *Philippi* decision, therefore, constitutes substantial authority as to the result which judges in a state court familiar with local circumstances (presumably quite similar in West Virginia and in its parent state, the Commonwealth of Virginia) have heretofore reached and would reach again in a diversity action like the present one. The result, unless it is clearly wrong to the point that we can say it would not be adhered to by a state court independently considering the matter, should be followed.[25]

2. Virginia Code § 49–26 in so many words creates a forfeiture. The Virginia courts have displayed a dislike for forfeitures and restricted relief which would lead to one. *Pence v. Tidewater Townsite Corp.*, 127 Va. 447, 103 S.E. 694 (1920).

With respect to this very statute, the Virginia court has followed that course. In *Davis' Administrator v. Snead*, 74 Va. (33 Gratt.) 705 (1880), the notice called for in what is now § 49–25 was given, not to the creditor himself but to a court-appointed receiver. Although the receiver clearly stood in the shoes of the creditor, the court avoided application of the statute and the consequent forfeiture which would result by determining that the notice did not comply with the statute which called for notice to the creditor or, in the event of his death, to his personal representative. The court ex-

plained the grounds for its decision: "The reason is obvious. The statute is very stringent in its operation.[26]

For those reasons, I would affirm.

---

against other cosureties (as, for example, Ruth) to insure payment of their *pro rata* shares of the default of the principal debtor. *See* Simpson, op. cit. n. 4, § 46, p. 198. As the West Virginia court pointed out, the fact that the statute substantially identical with §§ 49–25 and 49–26 did not afford a right to the cosurety to compel the creditor to go after cosureties did not preclude the cosurety from himself pursuing in equity his remedy against other cosureties.

**25.** Other authority on the point is non-existent as far as I have been able to discover. The district judge cited two cases which arguably might support Kosnoski's position. *See Colonial American Nat'l Bank v. Kosnoski*, 452 F.Supp. 135, 137 (W.D.Va.1978). The cases are ably distinguished by the district judge. There is an additional reason, over and beyond the critical differences in statutory language, why the cases afford no authority contrary to the position espoused in this dissenting opinion. *Moore v. Peterson*, 64 Iowa 423, 20 N.W. 744

(1884) and *W. T. Rawleigh Co. v. Moore*, 196 Ark. 1148, 121 S.W.2d 106 (1938), as well as the earlier Iowa case of *Harriman v. Egbert*, 36 Iowa 270 (1873), all concerned the adequacy of the demand by the surety to the creditor that suit be filed. Applying the principle that statutes in derogation of the common law are to be strictly construed, those cases refused to hold that the demanding surety was discharged from liability, because the demand had not been couched in terms of suing the other cosureties, as well as the principal. Such cases, whose results favored the creditor, are scant authority for the proposition Kosnoski here urges which would, if applied, cost the creditor Bank its rights against all the cosureties.

**26.** *Cf. Edmonson v. Potts' Administrator*, 111 Va. 79, 82, 68 S.E. 254, 256 (1910), which reached a similar result on analogous facts. The interpretation given § 49–26 was very restricted. The court commented: "That section is very stringent in its terms."