PRESENT:  All the Justices

JEAN T. CALLISON

                                                  OPINION BY
v.  Record No. 180555                     JUSTICE S. BERNARD GOODWYN
                                                April 18, 2019

JAMES B. GLICK, SUBSTITUTE TRUSTEE,
ET AL.

FROM THE CIRCUIT COURT OF THE CITY OF STAUNTON
Herbert G. Gill, Jr., Judge Designate

In this appeal, we consider whether the circuit court erred in refusing to declare a party a

subsurety to a loan obligation, holding that a purchase option contract was enforceable, and

declining to explain the meaning of its final order upon request of a party.

BACKGROUND

A.  *The Lease and Option*

On March 1, 2007, Waller Callison (Mr. Callison) leased his commercial property in

Staunton, Virginia (Property) to Elliott Chevrolet, Inc., which is owned by William Elliott, IV

(Elliott).[1]  The Property had a single building on it that Elliott Chevrolet used as an automobile

service center.  The lease term was five years with an automatic renewal.  Under the lease, Elliott

Chevrolet could "make additions or alterations to the Property" with Mr. Callison's consent.

The lease gave Elliott Chevrolet an "Option to Purchase" (Option).  Elliott Chevrolet had

the right to purchase the Property if Mr. Callison decided to sell the Property, if Mr. Callison

passed away, or "after the end of the first renewal term of this Lease."  The Option set a purchase

price to be determined by an appraiser.  It also stated:

---

[1] Elliott also owns Elliott & Elliott, LLC, which is the entity that owns Elliott Chevrolet
and other car dealerships.  Any reference in this opinion to Elliott also includes Elliott & Elliott
LLC, unless otherwise noted.

> If Tenant exercises the right to purchase the Property, the Property shall be conveyed to *Tenant, or its assign,* by General Warranty Deed with English Covenants of Title, *free and clear of all liens and encumbrances*, in exchange for payment of the full purchase price in immediately available funds.

(Emphases added.) The Option gave Elliott Chevrolet the "unqualified right to assign the [Option] at any time and such assignment shall be binding on Landlord," and stated it would "survive the death of Landlord, and shall be binding on their heirs and successors in interest." Mr. Callison and Elliott signed the lease and Option.

On March 25, 2011, Mr. Callison and Elliott signed a lease addendum, which fixed the Option purchase price for the Property at $550,000.

B. *Property Construction and Renovations*

Elliott and David Trainum (Trainum) owned ET Investments, LLC, which leased its various properties to Elliott's car dealerships. Elliott Chevrolet wanted to renovate the Property's existing building and also to construct a second building on the Property for an auto paint shop. Elliott and Trainum decided that ET Investments would fund the construction of the second building and the renovations on the Property, and that Elliott Chevrolet would eventually assign the Option to purchase the Property, at the fixed Option purchase price, to ET Investments.

On May 10, 2011, ET Investments took out a loan of $500,000 (Note) from Frontier Community Bank (Bank) to finance the construction and renovations of the Property. A "Commercial Guaranty" (Guaranty) of the Note was signed by Trainum, who personally guaranteed

> full and punctual payment and satisfaction of [Trainum's] Share of Indebtedness of [ET Investments] to [the Bank] and the performance and discharge of all [ET Investment's] obligations under the Note . . . . [The Bank] can enforce this Guaranty against [Trainum] even when [the Bank] has not exhausted [] remedies

2

against anyone else obligated to pay the Indebtedness or against any collateral securing the Indebtedness.

Trainum's "Share of Indebtedness" was 50% of any outstanding debt on the Note.

Another guaranty was signed by Elliott, personally, with the same terms as the Guaranty signed by Trainum, including responsibility for a 50% share of the indebtedness.

Also on May 10, 2011, Mr. Callison signed a "Construction Deed of Trust" (Deed of Trust), which secured the Note with the Property. The Deed of Trust stated:

> Except as otherwise provided in this Deed of Trust, [ET Investments] and [Mr. Callison] shall pay to [the Bank] *all indebtedness secured by this Deed of Trust* as it becomes due, and [ET Investments] and [Mr. Callison] *shall strictly perform all their respective obligations under the Note*, this Deed of Trust, and the Related Documents.
>
> . . . .
>
> [The Bank] may . . . declare immediately due and payable all sums secured by this Deed of Trust upon the sale or transfer, without [the Bank's] prior written consent, of all or any part of the [Property].

(Emphases added.) The Deed of Trust specified that the Bank's successors and assigns could enforce the Note.

Construction of the Property improvements began in 2011. In addition to paying Mr. Callison rent under the terms of the lease, Elliott Chevrolet also paid ET Investments $4,250 per month for the construction and renovations, and ET Investments in turn made monthly payments of a similar amount to the Bank on the Note.

Mr. Callison passed away intestate on November 26, 2011. His wife, Jean Callison (Mrs. Callison), was his only heir.

In early 2012, the construction and renovations suffered unanticipated cost overages. As a result, on April 23, 2012, ET Investments and the Bank increased the Note amount to $600,000.

3

The same day, Mrs. Callison signed a "Modification Agreement" (Modification Agreement) changing the Deed of Trust's language so that it secured "the repayment of any and all loans and/or advance" from ET Investments up to $600,000. The Modification Agreement also stated:

> Except as expressly modified above, the terms of the original Deed of Trust shall remain unchanged and in full force and effect . . . . It is the intention of [the Bank] to *retain as liable all parties to the Deed of Trust and all parties, makers and endorsers to the Note*, including accommodation parties, unless a party is expressly released by [the Bank] in writing.

(Emphasis added.)

The improvements were completed in 2012. Elliott Chevrolet continued its payments to Mrs. Callison under the terms of the lease, and to ET Investments for payment on the Note.

C. *Elliott Chevrolet Closes*

In the fall of 2015, Elliott's car dealerships began closing. On January 1, 2016, Elliott Chevrolet ceased its operations at the Property. Elliott Chevrolet subsequently stopped making its $4,250 monthly payments to ET Investments, and Elliott transferred his 50% interest in ET Investments to Trainum's wife.

At the end of January 2016, Trainum ceased ET Investment's monthly payments to the Bank on the Note. On February 8, 2016, Trainum executed a promissory note of approximately one million dollars to the Bank in exchange for acquiring several loan assets, including the Note. As manager of ET Investments, Trainum prevented ET Investments from paying anything further on the Note. Instead, Trainum arranged for ET Investments to pay his personal obligation on the one million dollar promissory note.

On February 19, 2016, Trainum—as the Note's holder—sent ET Investments, Elliott, and Mrs. Callison a default notice demanding immediate payment of the Note. In the notice,

Trainum stated he would foreclose on the Property via the Deed of Trust if the Note's balance of approximately $544,000 remained unpaid as of March 1, 2016. On March 23, 2016, Trainum sent Mrs. Callison a foreclosure sale notice for the Property, and set a foreclosure date of April 8, 2016.

*D. Proceedings in Circuit Court*

On March 29, 2016, Mrs. Callison filed a complaint in the Circuit Court of the City of Staunton against Trainum and ET Investments.[2] She asked the court:

> 1. To declare Trainum is the obligor and obligee of the Note, that the doctrine of merger extinguishes the obligation as a lien on the Property, and that Trainum is barred from foreclosing on the Property (Count I);
>
> 2. To declare Mrs. Callison is entitled to contribution from Trainum if the Property is foreclosed (Count II);
>
> 3. To temporarily enjoin the foreclosure sale of the Property until the case is resolved (Count III); and
>
> 4. To enter judgment against ET Investments and Trainum for the value of the Property in the event it is foreclosed upon (Counts IV–V).

On March 29, 2016, Mrs. Callison moved for a preliminary injunction to stop the foreclosure sale. At a hearing on the motion, Trainum agreed to postpone the foreclosure sale until resolution of the claims against him.

On June 20, 2016, Elliott Chevrolet assigned the Option to Mark Bowles (Bowles) for one dollar, after Trainum told Elliott that Bowles might be interested in the Option. Between July and September 2016, ET Investments paid Elliott Chevrolet's rent for the Property to Mrs. Callison.

---

[2] Mrs. Callison did not name Elliott as a defendant, but the circuit court later joined him as a defendant upon Trainum's motion.

On June 24, 2016, Mrs. Callison filed a lawsuit against Bowles.[3]  In her complaint, Mrs. Callison sought a declaratory judgment that Bowles must pay Mrs. Callison the $550,000 Option price without deduction for any amount due on the Note, or alternatively that Elliott Chevrolet must pay off the Note before Bowles can enforce the Option.

On August 2, 2016, Bowles notified Mrs. Callison that he was exercising the Option, and demanded she deliver title to the Property free of liens, including the Deed of Trust.  A month later, Bowles filed a complaint against Mrs. Callison seeking specific performance of the Option.

The circuit court consolidated Mrs. Callison's claims against Trainum, Elliott, and ET Investments, along with her claim against Bowles, and Bowles' claim against Mrs. Callison for specific performance, for purposes of a single trial.

At trial, Elliott testified as an adverse witness for Mrs. Callison, stating that Mr. Callison asked him to renovate the building and that Mr. Callison was supportive of the Property's new construction.  He stated that the Property's rent did not change after the construction and renovations were finished.  He also testified that Mr. Callison approached him about fixing the Option price.  Elliott testified that Trainum requested him to transfer the Option to Bowles.

Trainum was also called as an adverse witness by Mrs. Callison, and he stated that he purchased the Note to protect his own interest and prevent foreclosure by the bank.  He decided that ET Investments should not pay the Note obligation in February 2016, even though ET Investments had the money to make the payment.  He stated that ET Investments paid rent for

---

[3] Mrs. Callison also named Elliott Chevrolet as a defendant.  Upon agreement of the parties, Elliott Chevrolet was dismissed as a defendant in a Consent Order dated February 10, 2017.

the Property between July and September 2016 in order to protect its interest in the Property's newly-constructed second building and the equipment inside.

At the conclusion of Mrs. Callison's evidence, Trainum, Elliott, ET Investments, and Bowles all moved to strike Mrs. Callison's respective claims against them. They argued, in part, that Mrs. Callison's claims were not ripe for adjudication because a foreclosure sale of the Property and future subrogation and contribution lawsuits were all speculative. Mrs. Callison responded by arguing there was sufficient evidence to show she was a subsurety "under the original structure of the deal," and because equitable circumstances warranted the designation of her as a subsurety.

Before the circuit court ruled on the motions to strike, Mrs. Callison moved for leave to amend the complaint against Trainum, Elliott, and ET Investments. On May 19, 2017, the court granted leave, and continued the remainder of the trial. Mrs. Callison amended Count II against Trainum, Elliott, and ET Investments to request a declaratory judgment that Trainum and Elliott were each a principal surety, the Deed of Trust on the Property was the "secondary surety," and she had a right to be fully reimbursed by Trainum and Elliott for any payments she would have to make on the Note.

The circuit court subsequently recommenced the trial and took the motions to strike under advisement. The defendants then presented their evidence. Trainum testified that he bought the Note because "ET was out of money," and he wanted to prevent foreclosure. Elliott testified that Elliott Chevrolet would not have renewed the lease with Mr. Callison if Elliott Chevrolet had not been able to proceed with the renovations and construction of the second building. He also stated he assigned the Option to Bowles to avoid his rental obligations to Mrs. Callison.

7

In an opinion letter dated October 11, 2017, the circuit court stated that the various claims all turned on whether Mrs. Callison could be classified as a subsurety. The circuit court explained that Mrs. Callison could be classified as a subsurety if "the equities of the particular circumstances," favored her. The circuit court found that the equities did not favor her under the facts of the case, and that she was not a subsurety. The court also found that the Option held by Bowles was valid.

At a post-trial hearing, the circuit court heard arguments over proposed final orders for all the cases. Mrs. Callison asked the court to clarify that the dismissal orders would be "without prejudice to a later claim by [Mrs. Callison] that she is a cosurety." Trainum argued that such a request in effect sought an advisory opinion to avoid res judicata, and that such an issue was not before the court in these cases. Mrs. Callison responded that she was merely asking the court to clarify for future judges that the court did not rule on any contribution issues. The court refused to make Mrs. Callison's proposed changes, and decided it would enter the orders as drafted by Trainum.

In its final orders, the circuit court dismissed Mrs. Callison's claims against Trainum, Elliott, and ET Investments because (1) the merger doctrine did not apply, (2) the equities did not support Mrs. Callison as a subsurety, and (3) injunctive relief and monetary relief were mooted against Trainum after Trainum canceled the foreclosure sale. The court also dismissed the claims against Bowles with prejudice, and granted specific performance of the Option as requested by Bowles.

Mrs. Callison appeals. This Court granted the following assignments of error:

> 1. The trial court erred in holding that under the undisputed facts of the case, Appellant Callison's property could not be classified as sub-surety to David Trainum and William Elliott.

8

2. The trial court erred in holding that David Trainum is not barred from enforcement of the Deed of Trust lien against Jean Callison's real estate, and that Trainum is not barred from collecting on his Note from the proceeds of sale of Jean Callison's real estate pursuant to the exercise of the Option.

3. The Trial Court erred in holding that Jean Callison must close on the option to Mark Bowles for $550,000 and deliver the property to Bowles "free and clear of liens," even if that means Jean Callison would personally have to pay David Trainum more than the $550,000 she would receive, to do so.

4. The trial court erred in declining to clarify in its Final Order, that while *currently* ruling that Callison is not a *sub*-surety to David Trainum and William Elliott, and therefore, that David Trainum is not barred as holder of the Note secured by the Deed of Trust on Callison's property, from collecting on the Note from the proceeds of sale of her property; and while ruling that Callison was not *currently* entitled to any equitable relief or monetary contribution from ET Investments, David Trainum or William Elliott, because as of the time of Trial Callison had not yet suffered any financial damages; the Order was without prejudice to a *subsequent* lawsuit by Jean Callison seeking contribution against ET Investments as primary obligor, and David Trainum and William Elliott, as *co*-sureties, *after* she actually suffers a loss on account of the obligations for which Callison, and her property, are co-sureties.

(Emphasis in original.)

### ANALYSIS

Mrs. Callison argues the circuit court erred in refusing to declare her a subsurety because there were equitable circumstances which warranted her obligation on the Note being secondary to Trainum's and Elliott's obligations. She contends that, because she is a subsurety, Trainum cannot enforce payment of the Note from any proceeds Mrs. Callison receives from the Property's sale, and Bowles cannot compel a sale of the Property at the Option price, free of the Note's obligation. She also argues that the circuit court erred in refusing to clarify in its final orders that it was not ruling on Mrs. Callison's nonexistent, but potential future contribution claim.

The judgment of a circuit court will be set aside only if "it appears from the evidence that such judgment is plainly wrong or without evidence to support it." Code § 8.01-680. We thus

9

review all factual findings in the light most favorable to the prevailing parties below. *Palmer v. R.A. Yancey Lumber Corp.*, 294 Va. 140, 159 (2017). The circuit court's application of law to facts, however, is reviewed de novo. *Chamberlain v. Marshall Auto & Truck Ctr.*, 293 Va. 238, 242 (2017).

Circuit courts have the power to issue declaratory judgments as an adjudication of rights for any "actual controversy." Code § 8.01-184. "The authority to enter a declaratory judgment is discretionary and must be exercised with great care and caution." *USAA Cas. Ins. v. Randolph*, 255 Va. 342, 346 (1998).

*A. Subsurety*

For her first and second assignments of error, Mrs. Callison argues the circuit court erred in refusing to declare her a subsurety and to prevent the acceleration of the Note upon Bowles exercising the Option. She asserts that ET Investments is the primary debtor, Trainum and Elliott are the primary sureties, and she is a subsurety or accommodation surety. Mrs. Callison contends that, under *Chamberlain*, she is only secondarily liable for the Note because she is an accommodation surety who received no rent increase or other benefit from the Note. She also argues that the equitable circumstances of this case favor declaring her a subsurety because Trainum purchased the Note, directed ET Investments to stop paying on the Note, and then enforced the Note against only her.

A surety contract is a tripartite agreement between a debtor, a creditor, and a surety.[4] *First Virginia Bank-Colonial v. Baker*, 225 Va. 72, 77 (1983). In such a contract, the surety

---

[4] Court opinions and secondary sources use various nomenclature to describe the parties to a surety contract. This opinion uses the terms creditor (e.g. lender, obligee), debtor (e.g. borrower, obligor, primary obligor, principal obligor, principal), surety or principal surety (e.g. primary surety, secondary obligor), and subsurety (e.g. secondary surety).

promises to perform the debtor's obligation in the event the debtor fails to perform. *Id.*

Although the debtor has the "ultimate liability," the creditor can recover against either the debtor

or the surety for nonperformance of the obligation. *Id.*

Cosureties and subsureties are two distinct types of suretyship. *See* Restatement (Third)

Suretyship and Guaranty § 53(1) (1996).

A cosurety exists

if there be two parties bound as [debtor] and surety for a debt or other engagement, and a third party afterwards, at the request of the [debtor], bind[s] himself as surety for such debt or engagement, the two sureties, in the absence of any agreement to the contrary, become co-sureties of the same principal and for the same debt or engagement.

*Harnsberger v. Yancey*, 74 Va. 527, 540 (1880). Stated differently, a cosurety relationship exists

when there are multiple sureties, and "as between themselves, each should perform part of its

secondary obligation or bear part of the cost of performance." Restatement (Third) of Suretyship

and Guaranty § 53(2). Each cosurety enjoys a right of contribution against the other in the event

one cosurety pays more than his or her share of the obligation. *Mann v. Bradshaw*, 136 Va. 351,

377–78 (1923).

By contrast, a subsurety relationship exists when there are multiple sureties, and those

sureties agree that "as between themselves, one (the principal surety) rather than the other (the

subsurety) should perform or bear the cost of performance." Restatement (Third) of Suretyship

and Guaranty § 53(2) (internal quotation marks omitted); *see also Colonial Am. Nat. Bank v.

Kosnoski*, 617 F.2d 1025, 1032 (4th Cir. 1980) ("[T]he person claiming subsurety status must

have expressly conditioned his undertaking 'on nonperformance by the principal and the other

sureties.'"). In other words, a subsurety is only liable in the event the debtor and principal surety

are unable to perform the obligation, in which case the subsurety must perform and can seek

11

contribution from the debtor and principal surety.  Restatement (Third) of Suretyship and Guaranty § 59 cmt. c.  If the principal surety performs, however, the principal surety cannot seek contribution from the subsurety.  *See id.* §§ 59 cmts. a–c; 60.

In the absence of an express or implied agreement establishing the type of relationship between multiple sureties, there is a presumption that the sureties are cosureties.  *Harnsberger*, 74 Va. at 540; Restatement (Third) of Suretyship and Guaranty § 53(3).  Here, Trainum, Elliott, and Mrs. Callison have separate agreements that establish their individual obligations for ET Investment's payments on the Note.  Trainum and Elliott signed the Guaranty.  Mr. Callison signed the Deed of Trust, and after Mr. Callison's death, Mrs. Callison inherited the Property and subsequently signed the Modification Agreement for the Deed of Trust.  However, neither the Modification Agreement, Deed of Trust, nor the Guaranty describe the relationship between the Callisons and the other sureties, Trainum and Elliott.  Thus, the law presumes that they are cosureties.

This presumption can be overcome if a "subsuretyship relationship is established by *circumstances that demonstrate* that, as between themselves, one secondary obligor (the principal surety) rather than the other (the subsurety) *should perform* or bear the cost of performance."  Restatement (Third) of Suretyship and Guaranty § 53(3) (internal quotation marks omitted) (emphases added); *see Lowe v. Albertazzie*, 516 S.E.2d 258, 265 (W.Va. 1999) (describing this concept as an "equitable application of subsuretyship").

Surety sounds in contract.  *Sherman v. Shaver*, 75 Va. 1, 4 (1880).  We have held that awarding or denying equitable remedies in contract is within the sound discretion of the circuit court.  *Miller v. Reynolds*, 216 Va. 852, 856 (1976) ("The remedy of rescission is equitable in nature and is a remedy granted or denied within the sound discretion of the trial court.");

12

*Dickenson Cty. Bank v. Royal Exch. Assurance of London, England*, 157 Va. 94, 103 (1931)

("The power to reform instruments . . . is one of the peculiar branches of equity jurisdiction.")

(citation and internal quotation marks omitted); *Millman v. Swan*, 141 Va. 312, 318 (1925) ("The

specific performance of a contract is not a matter of absolute right, but rests in a sound, judicial

discretion.") (citation and internal quotation marks omitted).  We thus review the circuit court's

decision to deny an equitable remedy in contract, such as subsuretyship, for abuse of discretion.

*See Denton v. Browntown Valley Assocs.*, 294 Va. 76, 82–83 (2017).

Abuse of discretion means the circuit court has a "range of choice, and that its decision

will not be disturbed as long as it stays within that range and is not influenced by any mistake of

law." *Sauder v. Ferguson*, 289 Va. 449, 459 (2015) (citation and internal quotation marks

omitted).  An abuse of discretion occurs in three principal ways:

> when a relevant factor that should have been given significant weight is not
> considered; when an irrelevant or improper factor is considered and given
> significant weight; and when all proper factors, and no improper ones, are
> considered, but the court, in weighing those factors, commits a clear error of
> judgment.

*Landrum v. Chippenham & Johnston-Willis Hosps.*, 282 Va. 346, 352 (2011) (citation and

internal quotation marks omitted).  Thus, we will reverse a circuit court's equitable decision only

if reasonable jurists could not differ.  *Sauder*, 289 Va. at 459.

We find that the circuit court did not abuse its discretion in ruling that the equities in

favor of Mrs. Callison did not overcome the presumption of cosuretyship for two reasons.

Reasonable jurists could differ on whether the equities favored Mrs. Callison and the circuit

court was not influenced by any mistake of law.

Mrs. Callison identified some circumstances that arguably weighed in her favor.

Trainum purchased the Note.  He halted payments from ET Investments on the Note and used

13

funds from ET Investments to pay his personal obligation to the Bank. He then demanded payment from Mrs. Callison, a cosurety, and sought to foreclose on her Property because of ET Investment's failure to pay on the Note. Trainum used his position as the holder of the Note to selectively enforce the surety agreement entered by the Callisons, even though he was a personal guarantor and cosurety on ET Investment's defaulted loan.

Other circumstances weigh against Mrs. Callison, however. Trainum's purchase of the Note and subsequent enforcement did not violate any provision of the Note, Deed of Trust, Modification Agreement, Guaranty, or any law. *See Haleys v. Williams*, 28 Va. (1 Leigh) 140, 145 (1829) ("[E]quity follows the law."). Mr. Callison signed the Deed of Trust and Mrs. Callison signed the Modification Agreement contemporaneously with the increase of the Note amount to $600,000. Mr. and Mrs. Callison thus knew or should have known that the Property was collateral for the Note's entire obligation, and that the Note's obligation was more than the fixed Option price for the Property. Mr. and Mrs. Callison consented to the contractual arrangement with Trainum, Elliott, and ET Investments with knowledge of all facts material to their potential liabilities. The only change in circumstances that Mr. and Mrs. Callison may not have anticipated was the closure of Elliott's dealerships. Those closures, however, resulted in financial loss to Mrs. Callison and Trainum, as well as to ET Investments.

Considering Mr. and Mrs. Callison's voluntary entry into this business arrangement with knowledge of their potential liability, Trainum's contractually permissible acts to protect his interests, and both parties' mutual financial loss, there is evidence to support the circuit court's conclusion that the equities did not warrant imposing a subsuretyship in favor of Mrs. Callison. Although reasonable jurists could differ, we cannot conclude that the circuit court abused its discretion in refusing to declare Mrs. Callison a subsurety.

14

Contrary to Mrs. Callison's arguments, *Chamberlain* does not hold that an accommodation surety automatically has an obligation secondary to other cosureties, and is therefore a subsurety. In *Chamberlain*, we stated that an "accommodation or gratuitous surety is someone who assumes secondary liability on an obligation for the benefit of the principal rather than for their own profit." 293 Va. at 242. Mrs. Callison misreads *Chamberlain* by assuming that, if she is guaranteeing an obligation for the benefit of another, she is "secondarily liable" to the other sureties.

Accommodation surety and subsurety are distinct concepts. *Board of Supervisors of Fairfax Cty. v. Southern Cross Coal Corp.*, 238 Va. 91, 94–95 (1989). An accommodation surety benefits from a strict construction of the obligation, and its duty is discharged by any change to the obligation, while a compensated surety does not benefit from a strict construction and its duty is discharged only by a material change to the obligation. *Id*. A subsurety is a surety whose liability for the obligation is secondary to the obligations of other sureties. Restatement (Third) of Suretyship and Guaranty § 53. A cosurety's liability is not secondary to the obligations of other sureties. *Id*.

A surety can potentially be both an accommodation surety and a subsurety, but the surety must meet the independent definitions of each designation. Thus, even if Mrs. Callison is an accommodation surety, she would need to demonstrate that her obligation is "secondarily liable" to Trainum's and Elliott's surety obligations for her to also be a subsurety. The Deed of Trust stated Mrs. Callison had to "strictly perform all [] respective obligations under the Note," which does not suggest her obligation was secondary to the other sureties. The circuit court ruled that under the facts of this case, the equities were not such that Mrs. Callison could be classified as a subsurety. Because the circuit court made no mistake of law and there is evidence to support the

15

circuit court's determination that the equities of the case did not support Mrs. Callison being declared a subsurety, the circuit court did not abuse its discretion in refusing to declare Mrs. Callison a subsurety.

B. *Enforceability of the Option*

In support of her third assignment of error, Mrs. Callison argues that she will sell the Property to Bowles for $550,000 if Bowles accepts the Property subject to the Deed of Trust, or if Trainum releases the Deed of Trust so Mrs. Callison can receive the entire Option price. She contends the circuit court erroneously rejected these conditions because the court failed to cite authority or make findings of fact to support its decision regarding the enforceability of the Option.

We review a circuit court's interpretation of a contract de novo. *Schuiling v. Harris*, 286 Va. 187, 192 (2013). We review a circuit court's grant of specific performance of a contract for abuse of discretion. *Denton*, 294 Va. at 83. "He who seeks specific performance bears the burden of proving [] that there is a definite contract and that he has performed all that is required of him . . . and that all conditions precedent have been fulfilled." *Id*.

The Option gave Elliott Chevrolet the "unqualified right to assign the [Option] at any time and such assignment shall be binding on Landlord." It also gave the right to purchase the Property to "Tenant, or its assign . . . free and clear of all liens and encumbrances." "[F]ree from all encumbrances" means "freely and absolutely acquitted, exonerated and forever discharged, or otherwise by the said grantor or his heirs saved harmless and indemnified of, from and against any and every charge and encumbrance whatever." Code § 55-72 (internal quotation marks omitted).

16

Here, the circuit court did not abuse its discretion in granting specific performance of the terms of the Option, which require Mrs. Callison to convey the Property to Bowles "free and clear of all liens and encumbrances." Under the terms of the Option, Elliott Chevrolet had the "unqualified right" to assign the Option to Bowles, and Mrs. Callison inherited the obligation to satisfy the terms of the Option from Mr. Callison along with the Property. Because the Option was a definite contract and all its conditions precedent have been fulfilled, the circuit court was within its discretion to award Bowles specific performance of the terms of the Option.

*C. Court's Refusal to Clarify Final Order*

For her fourth assignment of error, Mrs. Callison argues that the circuit court erred in refusing to clarify that its final orders did not rule on Mrs. Callison's potential contribution claim. She asserts that the court's refusal will create future confusion on whether res judicata or collateral estoppel would bar a contribution action.

"There is no general requirement that trial courts must state for the record the reasons underlying their decisions." *Shannon v. Commonwealth*, 289 Va. 203, 206 (2015). The power of declaratory judgment does not give courts authority "to render advisory opinions, to decide moot questions, or to answer inquiries that are merely speculative." *USAA*, 255 Va. at 346. The defendants have argued that Mrs. Callison's claim for contribution is not ripe for adjudication. We agree. Mrs. Callison's contribution claim would not be ripe for adjudication until Mrs. Callison satisfies the Note's obligation. Clarifying a final order in the manner requested by Mrs. Callison would be akin to rendering an advisory opinion or answering a speculative question. The circuit court did not err in denying the request to clarify its orders as requested by Mrs. Callison.

CONCLUSION

Under the circumstances of this case, the circuit court did not err in refusing to declare Mrs. Callison to be a subsurety, granting specific performance of the Option as requested by Bowles, and declining to clarify its final orders regarding its effect on a future contribution claim. Accordingly, we affirm the judgment of the Circuit Court of the City of Staunton.

*Affirmed.*